IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of: | No. 84238-2-I |
| MANUEL PAREJO, | DIVISION ONE |
| | UNPUBLISHED OPINION |
| Petitioner. | |

DÍAZ, J. — Manuel Parejo brings a personal restraint petition, appealing revocation of his parole by the Indeterminate Sentence Review Board (ISRB or the Board). He argues that the Board's underlying finding that he violated two conditions of parole (associating with a known drug user and his unsuccessful discharge from sex offender treatment) were an abuse of discretion. We conclude the Board did not abuse its discretion.

## I. FACTS

### A. Parejo's Prior History

In 1978, Manuel Parejo was convicted of rape and kidnapping, both in the first degree and both while armed with a deadly weapon. A married couple picked him up while he was hitchhiking. Once in their truck, he threatened them with a

Citations and pin cites are based on the Westlaw online version of the cited material.

gun and forced them to drive him to a park. There, he tied up the husband, then raped the wife. Parejo was sentenced to a term of 180 months to life.

Between the 1970s and 90s he was intermittently incarcerated and serving parole, then was re-sentenced and incarcerated.[1] After 30 years of uninterrupted incarceration, he was granted parole on September 17, 2020. His release was subject to the rules and conditions of parole and community custody under the supervision of a Community Correction Officer (CCO).

The relevant conditions of his release were:

> E. You must not associate with known drug users or sellers, except in the context of a chemical dependency treatment program or drug support group . . . or other therapeutic settings approved by the CCO.
>
> G. You must enter into, follow all rules, successfully participate in, and complete the community phase of the Sex Offender Treatment and Assessment Program . . .
>
> J. You must not engage in a romantic or dating or sexual relationship without your CCO's prior permission. You must disclose your status as a sex offender and the nature of your offending to include unadjudicated victims, to anyone with whom you intend to begin such a relationship. The disclosure must be verified by the CCO.

Parejo was released from confinement and approved to live with his sister, her husband, and her son.

---

[1] For more history of the administration of Parejo's sentence, see, Matter of Parejo, 5 Wn. App. 2d 558, 561, 428 P.3d 130 (2018).

B. Events Leading to Re-Arrest and Hearing

The following facts are undisputed, except where indicated.

On Saturday, May 22, 2021, Parejo and Robert King (a friend, also serving on parole) were driving. They picked up a woman named "Rebecca,"[2] who flagged them down and asked for help.

While in the car, Parejo told Rebecca he was on very strict parole and had to tell his CCO everything. Rebecca asked to be taken to her friend's house. After attempting to find it, they gave up. Rebecca told them she really needed to leave the camp where she had been staying because "sometimes a couple guys would not let her leave that area."

Parejo described that he observed Rebecca was "pretty dirty" and he asked her if she was homeless, which she appeared to confirm. Parejo offered to let Rebecca "clean up" at his sister's house and get a good meal, for which he would need his sister's permission. Parejo testified he asked Rebecca if she had drugs on her, due to his conditions of parole. She said no.

Parejo, his sister, and his nephew all described Rebecca needing help walking down the hallway and to the shower. Then, after Rebecca was taken to the shower, Parejo and his nephew heard her fall down, went to check on her, and

---

[2] Rebecca's last name is unknown or not agreed upon by the parties, who also refer to her as "Rebecca" in briefing.

helped her up. Parejo's sister testified that she saw Parejo washing Rebecca's foot with a rag, and she "took over" from him.

Parejo offered Rebecca his bed. He said he spent his time in his room, sitting or laying on or near the bed. Parejo's nephew was also present and testified in a limited fashion to the same.

"A couple times on Saturday" Parejo tried to call his CCO who had an out-of-office voicemail saying he would return May 10th. Parejo did not leave a message, because he did not think he could, due to an out-of-office voice message with a date that had since passed. Parejo continued to try calling his CCO the next day, to no avail.

Late in the morning of Sunday, May 23, Rebecca told Parejo she was a methamphetamine user and wanted to "clean up" and "get some help." At some point that same day, she told Parejo she wanted to leave.

Parejo described that, also Sunday night, he was in his room where Rebecca slept under the covers. He testified to alternating between being in his chair and sleeping on the bed, "never under the covers."

During this time, Parejo claimed he wanted to make a "disclosure" to his CCO and take Rebecca to his CCO to "hear what she had to say." He contended nothing sexual occurred, and that Rebecca had "medical problems."

On the morning of Monday, May 24, Parejo texted his CCO:

4

I very much need to speak with you & bring you up to speed. I come in on the 25th. And need to bring in my lady for a disclosure. Please don't slow walk me on this. I have been a good boy. HELP!"

At some point, shortly after sending the text, Parejo left a voicemail for his CCO saying the "disclosure" was no longer necessary because Rebecca wanted to "go back to drugs." Parejo texted his CCO a second time and informed him a disclosure was no longer necessary. Parejo stated he never saw Rebecca use drugs, but he also told his CCO that "he had found paraphernalia," which neither independently verified.

Later that day, Parejo's CCO arrived at the residence and spoke with Rebecca. Both the CCO and Parejo describe that, when the CCO arrived at the residence, Parejo had to help Rebecca sit up in bed. The CCO described Rebecca as not coherent or observed her as semi-conscious. At some point when the CCO was at the residence, Rebecca stripped off her own clothes and said "everyone was a rapist."

Parejo's CCO asked Parejo what sort of contact took place between them and Parejo said they "kissed and hugged," but nothing further. Before the ISRB, Parejo disagreed, characterizing the kissing as a "peck on the forehead." He also claimed that, when he said he "hugged" her, he meant he was guiding Rebecca down the hallway as she was unable to walk.

CCO further testified Parejo stated he thought he had to disclose a relationship to his CCO only if he intended to have sex with the subject. Then Parejo told the CCO that the relationship was not romantic, and disagreed with the CCO's understanding of the condition on parole. During that discussion, Parejo and the CCO discussed whether they thought Rebecca had used methamphetamine or heroin, but no one contested she had used drugs recently.

The CCO placed Parejo under arrest. Approximately three weeks later, on June 10, 2021, Parejo was unsuccessfully discharged from certified sexual offender treatment program (CSOTAP).

C.    ISRB Hearing

On July 15, 2021, the ISRB held a hearing, presided by an ISRB board member, to evaluate Parejo's sentence and parole. At issue was whether Parejo violated parole conditions E, G, and J by:

1. Entering a romantic or sexual relationship without prior approval from Parejo's CCO on or about May 22, 2021;

2. Associating with a known drug user on or about May 22, 2021; and

3. Being unsuccessfully discharged from his CSOTAP.

During the hearing, Parejo admitted that, by Sunday, May 23, when Rebecca was at his sister's house, he knew she was a "meth user" and stayed with him "Sunday night into Monday."

6

The examiner found that there was inconclusive evidence regarding whether Parejo entered into a romantic or sexual relationship with Rebecca. Therefore, he was found not guilty on violation 1. However, the examiner found, based on a preponderance of the evidence, Parejo was guilty of violations 2 and 3 for associating with a "known drug user" and for exhibiting concerning behavior leading to his unsuccessful discharge from his sex offender community treatment program.

The examiner noted that, after reviewing the CSOTAP termination, the termination was not about a romantic or sexual relationship, rather Parejo's physical contact and continued close proximity with a person who had a very limited ability to give consent.

In a final decision of the Board member dated July 19, 2021, Parejo's parole was revoked. Approximately two weeks later, the ISRB affirmed the decision and set a new minimum term of confinement of 36 months. Parejo now brings this personal restraint petition arguing the ISRB's findings for violations 2 and 3 were an abuse of discretion.[3]

## II.    ANALYSIS

### A.    Standard of Review

---

[3] For clarity's sake, violations 2 and 3 will herein after be referred to as violations 1 and 2, following the parties's briefing.

7

ISRB decisions setting a new minimum term are reviewed for an abuse of discretion. In re Dyer ("Dyer III"), 175 Wn.2d 186, 196, 283 P.3d 1103 (2012) (citing In re Pers. Restraint of Locklear, 118 Wn.2d 409, 418, 823 P.2d 1078 (1992).

This court reviews ISRB decisions with substantial deference. Id. (citing In re Pers. Restraint of Whitesel, 111 Wn.2d 621, 628, 763 P.2d 199 (1988) (footnote omitted); In re Pers. Restraint of Ecklund, 139 Wn.2d 166, 170, 985 P.2d 342 (1999)). Washington courts have often concluded that courts "are not a super [ISRB] and will not interfere" with an ISRB determination unless the ISRB has abused its discretion. Id.

An abuse of discretion may be found where the ISRB "fails to follow its own procedural rules for parolability hearings" or where the ISRB bases its decision on speculation and conjecture only. Id. (citing In re Dyer ("Dyer II"), 164 Wn.2d 274, 286, 189 P.3d 759 (2008)).

The petitioner bears the burden to prove the ISRB abused its discretion. Id. (citing In re Pers. Restraint of Addleman, 151 Wn.2d 769, 776, 92 P.3d 221 (2004)); see also, RAP 16.5.

The ISRB "shall give public safety considerations the highest priority when making all discretionary decisions on the remaining indeterminate population

regarding the ability for parole, parole release, and conditions of parole." RCW 9.95.009(3).

1.      Violation 1: Associating with a Known Drug User

Parejo contends the ISRB's revocation of his parole for violation 1, association with a known drug user, was an abuse of discretion. We conclude the ISRB did not abuse its discretion in finding that Parejo knew Rebecca used drugs and stayed in her presence for at least one more night.

a.      Law

"A community custody condition is valid if a person of ordinary intelligence can understand what behavior a condition forbids, given the context in which its terms are used." State v. Houck, 9 Wn. App. 2d 636, 643, 446 P.3d 646 (2019) (citing State v. Hai Minh Nguyen, 191 Wn.2d 671, 679, 425 P.3d 847 (2018)).

In Houck, this court examined a condition of release requiring a parolee to avoid associating with "known drug users," holding "the condition does not explicitly require further definition or clarification from a CCO and the term 'known drug users/sellers' effectively notifies a person of ordinary intelligence who needs to be avoided." Houck, 9 Wn. App. 2d at 645. "The term 'known' qualifies that the condition prohibits the *offender's* knowing contact with drug users and sellers." Id. (citing In re Pers. Restraint of Brettell, 6 Wn. App. 2d 161, 170, 430 P.3d 677 (2018); United States v. Vega, 545 F.3d 743, 749-750 (9th Cir. 2008)). "By limiting

the condition's reach to those *known by the offender*, the condition provides fair warning of proscribed conduct and meaningful guidance to protect against arbitrary enforcement." Houck, 9 Wn. App. 2d at 645 (emphasis added).

    b.    Application of law to fact

Parejo claims that (1) he did not know Rebecca used drugs and (2) that, if he did, she was a *past* drug user because she stated she did not want to use drugs upon leaving the encampment.[4] It is not an abuse of discretion for the ISRB board to review the available evidence and reject these arguments.

The ISRB heard testimony that Rebecca was impaired from the minute he picked her up near the homeless encampment, commenting she seemed "off," was having trouble walking and bathing, and mentioning the "power from Eden" at her former encampment. Even two days later, when interviewed by the CCO, Rebecca had trouble sitting up in bed and was not coherent or observed in a semi-conscious state.

Furthermore, Parejo testified that, while he believed she was trying to stop using drugs when he picked her up on Saturday, she told him she wanted to "go

---

[4] In making these arguments, Parejo cites to cases where parolees challenge the restriction of "associating with known drug users" as unconstitutionally vague. That argument would facially fail on the law, so instead we will consider Parejo's first argument (that the ISRB abused its discretion in finding he knew Rebecca used drugs), rather than considering the argument to be an objection to the condition itself.

back to drugs" again no later than Sunday morning. In other words, by at least Sunday, he knew she was a drug user, both past and future. Moreover, Parejo admitted he found her drug paraphernalia. In short, Parejo knew she was a "meth user" and stayed with him "Sunday night into Monday."

For all these reasons, it is far from "speculation and conjecture" to conclude he was associating with a known drug user. Dyer II, 164 Wn.2d at 286. Indeed, it would be an exercise in speculation (and a very fine line draw) to find that he was not associating with a drug user because she *may* not have used on one of the three days they were together.

As such, it was not inconsistent with the Board's procedural rules or speculative for the ISRB to conclude Parejo knew Rebecca had recently used and planned to use drugs. Therefore, the ISRB's finding of violation 1 was not an abuse of discretion.

### 2. Violation 2: Unsuccessful Discharge from CSOTAP

Parejo next argues that the ISRB abused its discretion in finding violation 2 because he was discharged from CSOTAP. We disagree and conclude the ISRB did not abuse its discretion in making this finding.

#### a. Law

As stated earlier, the ISRB abuses its discretion when it fails to follow its own procedural rules for parolability hearings or bases its decision on speculation

and conjecture only. Dyer III, 175 Wn.2d at 196 (citing Dyer II, 164 Wn.2d at 286). Further, this court "must find the ISRB acted willfully and unreasonably to support a determination that the parolability decision is arbitrary and capricious." Matter of Brashear, 6 Wn. App. 2d 279, 286, 430 P.3d 710 (2018) (quoting Dyer II, 164 Wn.2d at 286). Again, Parejo bears the burden of showing the ISRB abused its discretion. Dyer III, 175 Wn.2d at 196. (citing Addleman, 151 Wn.2d at 776).

More specific to this claim, "Throughout [the parole revocation] process, the ISRB maintains broad discretion over early release or transfer to community custody, with public safety as its paramount concern." Simon v. Murphy, No. C12-0979JLR-MAT, 2013 WL 2155658, at *8 (W.D. Wash. May 16, 2013) (court order) (quoting Dyer III, 175 Wn.2d at 286). "For this reason, the ISRB may consider a sex offender's lack of treatment when making decisions about release." Id. (quoting Dyer III, 175 Wn. 2d at 199). In other words, "settled law establishes that the ISRB may consider the offender's failure to obtain treatment." Dyer II, 164 Wn.2d at 288.

Moreover, our Supreme Court has "adopted the position that 'the first step toward rehabilitation is 'the offender's recognition that he was at fault.''" Id. (citing Ecklund, 139 Wn.2d at 176). And, it has held that the unparolability can be justified by, among other factors, a putative parolee's "minimization of his problems, and the events surrounding his" violation. Dyer III, 175 Wn. 2d at 199.

12

b.     Application of Law to Fact

Parejo argues that he was discharged from CSOTAP based on his CCO's statement that he had entered into some kind of romantic or sexual relationship with Rebecca (formerly violation 1), a condition for which the ISRB found him not guilty.  He claims the ISRB thereby engaged in circular reasoning.

His argument that he was unsuccessfully discharged from CSOTAP for a condition which he was found innocent does not hold water for two reasons: (a) because he was discharged from CSOTAP for other reasons, which did not depend on the finding that Parjeo entered into a romantic or sexual relationship with Rebecca; and (b) failure to fully participate in and follow the rules for CSOTAP are independently grounds for violation of his conditions of parole.

As to the former, the treatment provider's discharge report does not say that he was being discharged from the program merely because he entered into a romantic or sexual relationship.   Rather, the treatment provider reported that Parejo:

- admitted "he was aware she was under the influence of drugs";

- "failed to recognize what should have been obvious choices such as calling the police or removing himself from a potentially dangerous situation";

- "did not see anything wrong with having physical, sexual contact with someone who appeared to be under the influence of drugs;

- "appears at least in part to be driven by preoccupation with sex";

- "disclosed that he had physical contact to include kissing and helping to bathe her."

The provider concluded that he discharged Parejo from treatment because of "admitted behaviors which involved picking up a stranger/hitchhiker, physical and potentially sexual contact with a woman who appeared to be incapacitated." In other words, Parejo was discharged for risky, predatory and "concerning" behaviors, with someone who may not have "had the ability to consent," even if they resulted in only "potential" sexual contact.

For its part, the Board likewise distinguished between "potential" sexual contact, on the one hand, and the reasons for his treatment discharge, as well as the additional reasons provided by his CCO, on the other. Namely, the Board found that his "'unsuccess [sic.] discharge' is a failure to fully participate in that program and follow all the rules." Further, the Board relied on the CCO's assessment that Parejo's "lack of judgement," "failure to grasp the offense related nature of his current behavior," and "high risk status" meant he was "no longer safe to remain in the community." Finally, the Board found that Parejo's explanation to the Board was an exercise in "minimizing and avoiding responsibility for his behavior, offering little or no insight into the concerning risk related nature of his own behavior."

14

In sum, Parejo did not cite to an ISRB policy or procedure the Board violated. And, we conclude that ISRB did not act "willfully and unreasonably" in reaching its parolability decision and, thus, it did not act in an "arbitrary and capricious manner." Brashear, 6 Wn. App. 2d at 286. Therefore, we conclude the ISRB did not abuse its discretion.

For these reasons, Parejo had not carried his burden in establishing that either of the ISRB's findings of violations and its subsequent revocation of his parole were not an abuse of discretion.

### III. CONCLUSION

Therefore, we deny Parejo's petition.

Díaz, J.

WE CONCUR:

Coburn, J.          Smith, C.J.